1

2

3

4                              UNITED STATES DISTRICT COURT

5                            NORTHERN DISTRICT OF CALIFORNIA

6

7

8    IDENTITY ARTS, a California Limited
     Liability Company,

9                   Plaintiff,                    No. C 05-4656 PJH
                                                  No. C 06-1631 PJH
10        v.

11   BEST BUY ENTERPRISE SERVICES        **ORDER GRANTING IN PART
     INC., a Minnesota Corporation, et al.,       AND DENYING IN PART
12                                                DEFENDANTS' MOTIONS FOR
                    Defendants.                   JUDGMENT ON THE PLEADINGS**
13   _____/

14   GEE JEFFERY & PARTNERS
     ADVERTISING, INC.,

15                  Plaintiff,

16        v.

17   BEST BUY CO., INC., et al.,

18                  Defendants.

19   _____/

20

21        Defendants' motions for judgment on the pleadings in the above consolidated cases

22   came on for hearing before this court on November 29, 2006.  In connection with Identity

23   Arts, LLC v. Best Buy Enter. Servs., Inc., et al. ("Best Buy I"), plaintiff Identity Arts, LLC

24   ("Identity Arts") appeared through its counsel, Drexel A. Bradshaw and Scott Friedman.

25   Defendants Best Buy Enterprise Services, Inc. and Best Buy Co., Inc. (collectively "Best

26   Buy") appeared through their counsel, David Martinez.  In connection with Gee Jeffery &

27   Partners Advertising, Inc. v. Best Buy Enterprise Serv., Inc., et al. ("Best Buy II"), plaintiff

28   Gee Jeffery & Partners ("GJP") appeared through its counsel, David Atlas, Michael E.

United States District Court

For the Northern District of California

Dergosits, and Francis X. Dehn.  Defendants Best Buy, Identity Arts[1], Sprint Corporation

("Sprint"), and AMC Entertainment, Inc. ("AMC") appeared through their counsel, David

Martinez, Roger Myers, Adam Brezine, and Catherine E. Maxson.  Having carefully

reviewed the parties' papers and considered the arguments and the relevant legal

authority, and good cause appearing, the court hereby GRANTS defendants' motions in

part and DENIES defendants' motions in part, for the reasons stated at the hearing, and as

follows.

## BACKGROUND

The instant actions are based on allegations of copyright infringement.  Both actions

– which have been related and consolidated for pretrial purposes – are heavily intertwined.

The relevant allegations with respect to each are detailed below.

A.     Best Buy I

In May 2000, while at a theater presentation of the movie "Gladiator," David Janssen

witnessed a fellow movie-goer being harassed and heckled for receiving a cell phone call

mid-movie.  See Second Amended Complaint for Damages and Injunctive Relief for

Copyright Infringement, Unfair Competition, Breach of Implied Contract, and Unjust

Enrichment ("Best Buy I SAC"), ¶ 16.  As a result of that incident, Janssen was struck with

an idea – to create faux movie trailers to be shown prior to the commencement of movies,

in which cell phone users would be encouraged to shut off their phones.  See id. at ¶ 17.

To implement his idea, Janssen enlisted the help of friend David Bobrow, and the

two began working on plans to film and market a short version of a faux movie trailer known

as the "Submarine Spot."  Id. at ¶¶ 19-20.  The Submarine Spot features a trailer in which

the operators of a submarine are killed when, at a time requiring absolute silence, a cell

phone from somewhere in the audience begins to ring.  Id. at ¶ 18.  In March 2002,

Janssen registered a script for the Submarine Spot ("Submarine Spot script") with the U.S.

---

[1]     Also included as part of the Identity Arts defendants are individual defendants David Janssen and David Bobrow.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

Copyright Office, and that same month, Janssen and Bobrow (along with the help of another friend, Ben Nichols) filmed several scenes of the copyrighted script and edited them into a rough cut of the Submarine Spot. Id. at ¶¶ 21-22.  Armed with the rough cut Submarine Spot, Janssen and Bobrow co-founded plaintiff Identity Arts, in order to produce, promote, and sell the rough cut spot to cell phone manufacturers, cell phone service providers, and movie theater chains. Id. at ¶ 23.

In June 2003, Identity Arts sent the rough cut Submarine Spot to Best Buy. See Best Buy I SAC, ¶ 25.  Thereafter, and throughout 2003, the parties negotiated an agreement whereby they agreed to shorten the rough cut Submarine Spot and turn it into a final Submarine Spot that would be displayed in movie theaters (the "Agreement").  The Agreement was executed by both parties on October 7, 2003. See id. at ¶¶ 26, 37-38. During this negotiation, Identity Arts also alleges that it told Best Buy about a related marketing strategy it had in place to market the Submarine Spot to cell phone manufacturers, cell phone service providers and movie theater chains. Id at ¶ 26.

Throughout October 2003, Identity Arts revised and edited the rough cut Submarine Spot, and turned it into the final Submarine Spot. See id. at ¶ 40.  Identity Arts then sent Best Buy the final Submarine Spot on October 28, 2003, advising Best Buy that it had up to 10 other ideas for cell phone courtesy messages, similar to the Submarine Spot. Id. at ¶ 42.  Best Buy never took Identity Arts up on those ideas, and never signed any additional license agreements with Identity Arts. See, e.g., id. at ¶¶ 45-46.

Instead, Identity Arts alleges that after the final Submarine Spot was successfully promoted by Best Buy in AMC movie theaters throughout the country, Best Buy proceeded to introduce other faux movie trailers, including those entitled "The Buffalo" (in which Native Americans are interrupted by cell phone ringing during a buffalo hunt), "Pump up the Movie" (a parody of the "Bring It On" cheerleading movie), and "Return of the Kwan" (a martial-arts themed spot reminiscent of "Crouching Tiger, Hidden Dragon"). See Best Buy I SAC, ¶ ¶ 47, 49, 56, 64.  Identity Arts alleges that each spot is a derivative work of the

United States District Court

For the Northern District of California

Submarine Spot, nearly identical in their use of story structure, design, and relevant elements. Id. at ¶¶ 50-51, 57-58, 65-66. None of the spots was done with Identity Arts' permission or authorization.

As a result of Best Buy's alleged creation of unauthorized derivative works, Identity Arts filed the Best Buy I action against the Best Buy defendants on November 14, 2005. In its original complaint, Identity Arts asserted five causes of action against the Best Buy defendants: (1) direct copyright infringement; (2) vicarious copyright infringement; (3) contributory copyright infringement; (4) unfair competition under California Business & Professions Code §17200; and (5) unjust enrichment. Identity Arts then requested a preliminary injunction enjoining defendant Best Buy from showing any derivative works of any sort pending resolution of the merits of the action. The court denied Identity Arts' request on February 10, 2006. Immediately following, on February 21, 2006, the court granted a motion to dismiss filed by the Best Buy defendants, and dismissed Identity Arts' fourth and fifth causes of action alleging state law claims, albeit with leave to amend them.

Identity Arts filed the current, and operative, Second Amended Complaint in this action on June 16, 2006.[2] The SAC alleges the same causes of action as those alleged in its original complaint, and adds one new claim for breach of implied contract (for a total of six causes of action), based on new allegations regarding the marketing strategy that Identity Arts contends it disclosed to Best Buy during negotiations over the agreement between the parties. See Best Buy I SAC, ¶¶ 78-173.

B.    Best Buy II

GJP is a Canadian advertising agency. In late 1997, GJP developed a concept aimed at encouraging theater patrons to turn off their cellular telephones during films. See Second Amended Complaint for Damages and Injunctive Relief for Copyright Infringement, Breach of Implied Contract, and Unjust Enrichment ("Best Buy II SAC"), ¶ 16. The concept

---

[2]    Prior to the filing of Identity Arts' SAC, on January 30, 2006, Identity Arts registered the copyrights for both the rough cut Submarine Spot, and the final Submarine Spot. See Best Buy I SAC, ¶¶ 71-72.

involved the creation of several high quality, short films, about 2 minutes in length, that would be shown in theaters.  See id. at ¶ 17.  The spots would be made to look like movie trailers for coming attractions, but at the end of the trailer, the movie audience would discover that the trailer was in reality a courtesy message asking the audience to turn off cell phones during the movie.  Id.  Each spot was to be tagged with the name and logo of a sponsor, and GJP's plan was to market these spots through license agreements to different and multiple sponsors.  Id.

Over time, GJP produced three spots – "Phone Bomb," "Action Fighter," and "Cell Block."  See id. at ¶¶ 19-21.  Phone Bomb depicts a team of uniformed military-esque men under tense circumstances trying to prevent a sound-sensitive weapon from exploding.  At the crucial moment, the plot is disrupted by a ringing cell phone.  Id. at ¶ 20.  Action Fighter involves a martial arts sequence and story line, which is also interrupted by a ringing cell phone.  See Best Buy II SAC, ¶¶ 21, 32.  Cell Block is also structured in a similar way.  Id. at ¶ 21.

GJP alleges that, since 1998, it has held out Phone Bomb, Action Fighter, and Cell Block to the advertising industry and to potential clients as an example of GJP's creativity and work product.  See id. at ¶ 24.  Since that time, it has also licensed all three spots to advertisers in various countries, generating revenues for GJP, as well as recognition and praise for its creative advertising.  Id.

On November 1, 2000, a GJP partner attended a meeting in Cincinnati, which was also attended by senior executives from defendants Sprint and Best Buy.  See Best Buy II SAC, ¶ 25.  GJP alleges that at this meeting, it exhibited Phone Bomb, Action Fighter, and Cell Block, and furthermore advised all present at the meeting that all spots were available to be licensed for use in the United States.  Id.  GJP asserts that, at the meeting, David Sprosty, a Best Buy merchandise manager, expressed "keen interest" in the spots, and asked if he could take the videotape containing all three spots back to Best Buy to show to his colleagues.  Id. at ¶ 27.  GJP gave him the videotape, but never heard from him again.

**United States District Court**

For the Northern District of California

1  Id. at ¶ 28.

2       Subsequently, GJP learned that Best Buy had partnered with Sprint and AMC to

3  produce and exhibit its own faux movie trailers in theaters in the United States.  Best Buy II

4  SAC, ¶ 29.  GJP specifically learned that these defendants had produced and were

5  exhibiting the Submarine Spot, and Return of the Kwan.  Id.  GJP alleges that both are

6  substantial copies of Phone Bomb and Action Fighter.  See id. at ¶ 30.  Although GJP

7  alleges that Identity Arts is the original author of Submarine Spot, GJP alleges that Identity

8  Arts themselves copied Phone Bomb in order to work in concert with defendants to copy

9  GJP's works.  Id. at ¶ ¶ 34-37.  GJP's works are registered with the US Copyright Office.

10  Id. at ¶ 40.

11       GJP filed its original complaint against all defendants in federal court in New York on

12  December 15, 2006.  The case was then transferred to this court for consolidation with

13  Best Buy I, on March 1, 2006.  GJP has since filed subsequent complaints, and the current

14  operative complaint is the Second Amended Complaint, filed on August 4, 2006.  The

15  second amended complaint alleges four causes of action against defendants: (1) copyright

16  infringement (against all defendants); (2) copyright infringement (against Best Buy, Sprint,

17  and AMC); (3) breach of implied contract (against Best Buy and Sprint); and (4) unjust

18  enrichment (against Best Buy and Sprint).  See Best Buy II SAC, ¶¶ 41-71.

19       C.    Instant Motions

20       The Best Buy I and Best Buy II defendants have moved for judgment on the

21  pleadings pursuant to Federal Rule of Civil Procedure 12(c).  In the Best Buy I action, the

22  Best Buy defendants jointly move for judgment on the pleadings with respect to all six

23  causes of action brought by plaintiff Identity Arts.  In the Best Buy II action, three different

24  motions for judgment on the pleadings have been filed: (1) a motion brought by defendant

25  Identity Arts; (2) a motion brought by defendant AMC ; and (3) a motion brought jointly by

26  the Best Buy defendants and defendant Sprint.  The AMC and Identity Arts defendants

27  move for judgment with respect to the federal copyright claims only, while the Best Buy and

28

1   Sprint defendants move for judgment with respect to all four causes of action.[3]

2                                **DISCUSSION**

3       A.    Legal Standard

4       Federal Rule of Civil Procedure 12(c) provides that any party may move for

5   judgment on the pleadings "after the pleadings are closed, but within such time as not to

6   delay the trial." See Fed. R. Civ. Proc. 12(c).  A motion for judgment on the pleadings

7   challenges the legal sufficiency of the opposing party's pleadings, and the allegations

8   contained therein.

9       The standard applied by court in treating a motion for judgment on the pleadings is

10  the same as that applied by the court in considering motions to dismiss under FRCP

11  12(b)(6).  In short, judgment on the pleadings is appropriate when, even if all material facts

12  in the pleading under attack are true, the moving party is entitled to judgment as a matter of

13  law.  See, e.g., Hal Roach Studios, Inc. v. Richard Feiner & Co., Inc., 896 F.2d 1542, 1550

14  (9th Cir. 1989).

15      B.    Best Buy I

16      The Best Buy defendants have moved for judgment on the pleadings with respect to

17  all six causes of action alleged in Identity Arts' second amended complaint.  Defendants

18  seek dismissal of plaintiff's federal copyright claims for three reasons: (1) plaintiff lacks

19  standing; (2) plaintiff's allegations fail to establish any substantial similarity of protected

20  expression; and (3) even if plaintiff's ideas and concepts are copyrightable, plaintiff granted

21  Best Buy a license to use plaintiff's concept.  As for plaintiff's remaining state law claims,

22  _____

23          [3]    The parties in both actions have also filed requests for judicial notice.  In the Best
24  Buy I action, plaintiff Identity Arts seeks to have the court take judicial notice of the Declaration
    of Robert Viannello, submitted in connection with plaintiff's earlier motion for preliminary
    injunction.  The Best Buy defendants seek to have the court take judicial notice of several prior
25  orders and pleading in connection with the prior motion for preliminary injunction.  The court
    hereby GRANTS both parties' requests.  In the Best Buy II action, defendant AMC seeks to
26  have the court take judicial notice of the second amended complaint filed in the Best Buy I
    action, and the Best Buy and Sprint defendants seek judicial notice of certain pleadings and
27  orders filed in both the Best Buy I and Best Buy II actions.  The court also GRANTS the parties'
28  requests.

                                      7

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  defendants argue that plaintiff's claims are preempted by federal copyright law, and

2  additionally fail to state a claim for other reasons.

3      In sum, therefore, resolution of defendants' motion here requires analysis of the

4  following: (1) whether plaintiff's copyright causes of action fail for lack of standing; (2)

5  whether plaintiff's copyright causes of action fail for lack of substantial similarity between

6  works; (3) whether plaintiff's copyright causes of action fail pursuant to the license

7  agreement between the parties; (4) whether plaintiff's state law claims fail on preemption

8  grounds; and (5) whether plaintiff's state law claims individually fail on their merits.

9      A few preliminary points are in order, however.  First, it is worth noting at the outset

10  that, as the Best Buy defendants point out in their motion, many of the arguments at issue

11  here were previously considered by the court, in connection with either plaintiff's earlier

12  motion for preliminary injunction, or defendants' earlier motion to dismiss.  Accordingly, to

13  the extent certain issues are relevant and have already been decided by the court, the

14  court relies on its prior orders, as indicated more fully below.

15      Second, *both* Best Buy I and Best Buy II plaintiffs make much of the procedural

16  argument that decisions as to copyright infringement – and in particular, substantial

17  similarity issues – are not proper on 12(c) motions for judgment on the pleadings.  Plaintiffs

18  are correct that many times, the issue of substantial similarity is not amenable to resolution

19  without a trial.  See, e.g., Frybarger v. International Business Machines Corp., 812 F.2d

20  525, 528 (9th Cir.1987)(summary judgment is not highly favored on issue of substantial

21  similarity).  However, summary judgment may be granted if the evidence in the record,

22  combined with every inference reasonably drawn in favor of the non-moving party,

23  demonstrates that no reasonable jury could find substantial similarity.  See id.; see also

24  Funky Films, Inc. v. Time Warner Entmt. Co., 462 F.3d 1072, 1076-77 (9th Cir.

25  2006)("substantial similarity 'may often be decided as a matter of law'").  It follows,

26  therefore, that judgment on the pleadings may be granted where the facts asserted by the

27  non-moving party in its pleadings – including the attached works themselves – and all

28

8

United States District Court

For the Northern District of California

reasonable inferences from those facts, show the absence of substantial similarity.  See, e.g., Christianson v. West Pub. Co., 149 F.2d 202, 203 (9th Cir. 1945)("There is ample authority for holding that when the copyrighted work and the alleged infringement are both before the court, capable of examination and comparison, non-infringement can be determined on a motion to dismiss"); Cory Van Rijn, Inc. v. Cal. Raisin Advisory Bd., 697 F. Supp. 1136, 1145 (E.D. Cal. 1987)(granting motion to dismiss based on lack of substantial similarity).  As such, the court finds that it may properly consider the substantial similarity issue in conjunction with defendants' motion for judgment on the pleadings.  Moreover, plaintiff Identity Arts itself, while arguing against consideration of the substantial similarity issue on the instant 12(c) motion, simultaneously argues to the contrary in urging the court to find a lack of substantial similarly in connection with its own 12(c) motion in the Best Buy II action.[4]

With these observations in mind, the court now turns to the merits of defendants' 12(c) motion in Best Buy I.

       1.       Standing

Defendants assert that plaintiff lacks standing because Identity Arts failed to register the rough cut Submarine Spot and the final Submarine Spot until well after Identity Arts initiated the Best Buy I action.  Identity Arts, while acknowledging that registration occurred after the filing of its initial complaint – on May 5, 2006 – responds that this court has previously indicated its willingness to allow a copyright infringement suit to go forward where registration occurs after the filing of an initial complaint, but before the filing of a subsequent amended complaint.  Here, since registration occurred prior to the filing of the operative second amended complaint, Identity Arts claims that it has standing to proceed

_____

[4]    Indeed, the court notes, as defendants point out, that there is a certain inconsistency regarding Identity Arts' arguments before the court: while, as plaintiff, Identity Arts argues here that substantial similarity exists between the Submarine Spot and defendants' subsequent spots (i.e., "The Buffalo," "Pump up the Movie," and "Return of the Kwan"), it must rather awkwardly turn around and argue as a defendant in Best Buy II that the Submarine Spot is substantially _dis_similar from the Phone Bomb and Action Fighter spots.

United States District Court

For the Northern District of California

1   as to this operative complaint.

2       Technically, defendants are correct in their arguments.  Registration of a work is a

3   prerequisite to a suit for copyright infringement.  See 17 U.S.C. § 411(a).  While the court

4   would be within its authority to allow an action to be initiated prior to actual issuance of a

5   registration certificate but *after* the filing of an application for registration, there is a

6   jurisdictional defect under the copyright statutes for actions that are initiated *prior* to the

7   sending of an application for registration and in the absence of a certificate of registration.

8   See Nimmer on Copyright, § 7.16[B][1][a].  For that reason, when this issue arose in

9   connection with plaintiff's motion for preliminary injunction, the court held that plaintiff

10  lacked standing to sue for infringement of the two works in question, since at the time,

11  plaintiff had not yet filed an application for registration of the works.

12      Now, however, the facts are somewhat different.  Since the court's order on

13  plaintiff's motion for preliminary injunction, Identity Arts actually registered the works in

14  question, then subsequently amended its complaint in order to properly allege registration

15  of the works.  Accordingly, the question before the court is whether these new facts alter

16  the court's previous conclusion that plaintiff lacks standing.

17      In support of its position that any prior standing deficiencies have been cured,

18  Identity Arts relies on two district court cases.  See Brush Creek Media, Inc. v. Boujaklian,

19  2002 WL 1906620 (N.D. Cal. 2002); Ryan v. Carl Corp., 1998 WL 320817 (N.D. Cal. 1998).

20  Plaintiff's reliance on these cases, however, is misplaced.  As defendants point out, these

21  cases stand for the opposite proposition as that espoused by Identity Arts – i.e., both cases

22  actually dismissed infringement claims for lack of standing when those actions were filed

23  while an application was pending, but before a certificate of registration had issued.  See

24  Brush Creek Media, 2002 WL 1906620 at *5 ("[p]laintiff here cannot maintain his copyright

25  infringement claim at this time because [p]laintiff does not yet have a certificate of

26  registration of copyright."); Ryan, 1998 WL 320817 at *3 (granting motion to dismiss as to

27  copyright claims of class members whose copyright applications were still pending before

28

United States District Court
For the Northern District of California

1    the Copyright Office when amended complaint was filed).

2        More importantly, neither case addresses the actual question whether an amended

3    complaint filed post-registration suffices to cure lack of standing.  Nor does either party set

4    forward any dispositive Ninth Circuit authority on this point.  Perhaps the most instructive

5    Ninth Circuit case is Roth Greeting Cards v. United Card Co., 429 F.2d 1106 (9th Cir.

6    1970), a case previously considered by the court in connection with plaintiff's earlier motion

7    for preliminary injunction.  Roth Greeting Cards held that a plaintiff could institute his action

8    as of the day that he filed his application for registration, and that subsequently revised

9    copyright applications as to the same underlying work would relate back to the date of filing

10   of the initial application (where the revisions addressed a prior error).  It did not hold,

11   however, that subsequent complaints would relate back to the date of an application for

12   registration where the application was filed after the initial complaint.  Moreover, as

13   subsequent district court cases have noted, Roth Greeting Cards pre-dated the 1976

14   Copyright Act, which contained different language in its jurisdiction provision making it clear

15   that a plaintiff's registration certificate must issue prior to initiation of suit.  See, e.g., Loree

16   Rodkin Mgmt. Corp. v. Ross-Simons, Inc., 315 F. Supp. 2d 1053, 1055 fn. 1 (C.D. Cal.

17   2004).

18       There does appear to be some persuasive authority, however, for allowing a plaintiff,

19   subsequent to the filing of its original complaint, to register and deposit an allegedly

20   infringed work, and thereafter appropriately amend the complaint, without the necessity of

21   filing a new action.  See, e.g., Frankel v. Stein & Day, Inc., 470 F. Supp. 209 (S.D. N.Y.

22   1979); Haan Crafts Corp. v. Craft Masters, Inc., 683 F. Supp. 1234 (N.D. Ind. 1988).  The

23   Fifth Circuit, for example, has noted that, while the proper course for a plaintiff who lacks

24   standing due to a jurisdictional defect would appear to be the filing of a new action

25   altogether rather than the filing of an amended complaint, such a distinction is without

26   substance if no prejudice to the defendant is present.  See, e.g., Positive Black Talk, Inc. v.

27   Cash Money Records, Inc., 394 F.3d 357, 366-67 (5th Cir. 2004)("The notion that the

28

**United States District Court**

For the Northern District of California

1   supplemental pleading cures the technical defect, notwithstanding the clear language of

2   [the Copyright Act], is consistent with the principle that technicalities should not prevent

3   litigants from having their cases heard on the merits").

4        The court finds this reasoning persuasive.  While true that copyright registration –

5   and therefore standing – is fundamental to a plaintiff's ability to bring suit, there is no

6   dispute here that plaintiff has now alleged that such registration has taken place.  See, e.g.,

7   Best Buy I SAC, ¶¶ 71-72, 76-77.  As such, the jurisdictional defect caused by plaintiff's

8   earlier failure to register the alleged works has now been cured.  Furthermore, even if the

9   court were to grant dismissal of the copyright claims for lack of standing, plaintiff would

10  simply re-file a new action alleging the identical facts already pled in the current second

11  amended complaint with respect to registration of the works in question.  This result is

12  inefficient, to say the least.  In short, under such circumstances as these, the court finds

13  that plaintiff has cured its previous jurisdictional deficiencies under the Copyright Act with

14  the filing of its second amended complaint alleging registration of relevant works at issue in

15  the action.

16            2.      Substantial Similarity

17        In order for plaintiff to succeed on its claims for copyright infringement, plaintiff must

18  demonstrate (1) ownership of a valid copyright; and (2) defendant's copying of constituent

19  elements of the original work.  See, e.g., Feist Publications, Inc. v. Rural Tel. Serv. Co.,

20  499 U.S. 340, 361 (1991); Funky Films, 462 F.3d at 1076.  For purposes of the instant

21  motion, plaintiff has satisfactorily alleged that it is the owner of a valid copyright in the

22  Submarine Spot.  See Best Buy I SAC, ¶¶ 80-82.  With respect to the copying element of

23  plaintiff's infringement claim, neither party disputes that no allegation or evidence of direct

24  copying is present.  As such, plaintiff's proof of infringement will involve a fact-based

25  showing that defendants had access to plaintiff's work, and that the works in question are

26  "substantially similar."  See Funky Films, 462 F.3d at 1076; see also, e.g., Newton v.

27  Diamond, 349 F.3d 591, 594 (9th Cir. 2003)("[f]or an unauthorized use of a copyrighted

28

United States District Court

For the Northern District of California

1    work to be actionable, there must be substantial similarity between the plaintiff's and the

2    defendants' works").

3        This brings the court to the parties' primary point of debate.  For purposes of this

4    motion, defendants do not truly contest whether they had access to plaintiff's Submarine

5    Spot.  Rather, their focus is on asserting that no infringement is possible because an

6    objective comparison of the Submarine Spot with the allegedly infringing works – the

7    Return of the Kwan, Buffalo, and Pump up the Movie spots – makes it apparent that there

8    is simply not enough substantial similarity between the elements of the spots for any

9    protectable expression of ideas to exist.  Naturally, Identity Arts vigorously resists this

10   argument.

11       Substantial similarity is a highly fact specific inquiry.  The Ninth Circuit employs a

12   two-part test for determining whether one work is substantially similar to another.  See,

13   e.g., Funky Films, 462 F.3d at 1077; Shaw v. Lindheim, 919 F.2d 1353, 1356 (9th Cir.

14   1990).  The test permits a finding of infringement only if a plaintiff proves both substantial

15   similarity of general ideas under an "extrinsic test," and substantial similarity of the

16   protectable expression of those ideas under an "intrinsic test."  See, e.g., Litchfield v.

17   Speilberg, 736 F.2d 1352 (9th Cir. 1984).  The court, however, only applies the extrinsic

18   test; the intrinsic test is exclusively the province of the jury.  Funky Films, 462 F.3d at 1077.

19   The extrinsic test focuses on "articulable similarities between the plot, themes, dialogue,

20   mood, setting, pace, characters, and sequence of events" in the works in question.  See,

21   e.g., Kouf v. Walt Disney Pictures & Television, 16 F.3d 1042, 1045 (9th Cir. 1994); Metcalf

22   v. Bochco, 294 F.3d 1069, 1073 (9th Cir. 2002).  In applying the test, the court must

23   compare, not the basic plot ideas for stories, but the "actual concrete elements that make

24   up the total sequence of events and the relationships between the major characters."

25   Metcalf, 294 F.3d at 1074 ("[g]eneral plot ideas are not protected by copyright law"); see

26   also Olson v. Nat'l Broadcasting Co., 855 F.2d 1446 (9th Cir. 1988).  Expert testimony is

27   relevant in this regard.  See Funky Films, 462 F.3d at 1077.  The court must also "take care

28

United States District Court

For the Northern District of California

1  to inquire only whether the protectable elements, standing alone, are substantially similar,"

2  for protectable expression includes only the specific details of an author's rendering of

3  ideas.  See, e.g., id. (scenes a faire, which flow naturally from generic plot lines, are not

4  protectable).

5       Here, Identity Arts alleges a number of similarities between the Submarine Spot, and

6  defendants' spots "The Buffalo," "Return of the Kwan," and "Pump Up the Movie."

7  Specifically, Identity Arts alleges that a comparison of all works demonstrates use of the

8  following identical elements:

9       •    the "use of an original theme focusing on the world of movies;"

10      •    the "use of a montage of scenes and various cinematic devices to create a
            fast pace and tense mood, building to a desired break in the action;"

11
12      •    the "use of an off-screen audience member with a cell phone as a central
            character;"

13      •    the "use of unimportant characters to divert attention from the central off-
            screen audience character with the cell phone;"

14
15      •    the "use of a false setting to prevent the revelation of the central character's
            presence until a desired time;"

16      •    the "use of a false plot to steer audience focus away from the real plot, while
            building suspense, until a desired time;"

17
18      •    the use of "a dialogue to break the fourth wall and shift audience focus away
            from the false plot at the desired time;"

19      •    the use of "carefully crafted, screen-based dialogue specifically aimed at
            promoting a cell phone manufacturer/distributor/service provider's produce in
20           a selfless manner;"

21      •    and "overall the use of a highly intentional sequence of events geared
            towards catching audience attention by falsifying the look and feel of a movie
22           trailer, maintaining that attention through carefully crated cinematic
23           techniques and devices, and then capitalizing on that attention to promote a
            cell phone manufacturer/distributor/service provider's product."
24

25  See Best Buy I SAC, ¶ 43 (collectively referred to as the "Original Elements").

26      According to Identity Arts, these Original Elements are expressed in a unique and

27  independently created structure, follow a specific creative sequence, and are therefore

28

**United States District Court**
For the Northern District of California

1    worthy of copyright protection, whether individually or in combination.  Plaintiff argues that

2    from this, it follows that the works themselves, upon close inspection, decisively

3    demonstrate substantial similarity.  See, e.g., Identity Arts' Best Buy I Opp. Br. ("Best Buy I

4    Opp. Br.") at 7:22-23, 9:23-24.

5         While there are certain similarities between the works in question, actual analysis

6    of the works in question pursuant to the extrinsic test reveals significant differences and few

7    real similarities between the works as regards to plot, theme, dialogue, mood, setting, pace,

8    characters, and sequence of events.

9                         a.    plot

10        A work's plot is properly defined as "the sequence of events by which the author

11   expresses his theme or idea...".  See, e.g., Shaw v. Lindheim, 919 F.2d at 1363.  It refers,

12   in other words, to the story line inherent in a work.  The Submarine spot, upon which

13   Identity Arts bases its infringement claim, tells the story of a submarine crew located on a

14   submarine in the deep Pacific.  The crew's silent descent in what appear to be hostile

15   conditions is suddenly interrupted by the sound of a ringing cell phone coming from an off-

16   screen audience, and the crew urgently turns to the audience and attempts to silence the

17   sound, even as the ringing destroys the silence on screen and dooms the crew.

18        The Submarine spot must be compared here to defendants' three works – the

19   Buffalo, Return of the Kwan, and Pump Up the Movie.  The Buffalo spot tells the story of a

20   Native American tribe approaching the winter months having lost many of its tribe

21   members, presumably due to starvation.  The tribe must hunt in order to survive.  In the

22   midst of a critical hunt requiring silence, the hunt is interrupted by a ringing cell phone

23   coming from the audience, and as two tribe members turn to the audience in a frantic

24   attempt to silence the noise, the herd of buffalo runs away.  The Return of the Kwan

25   depicts yet another story line, belonging to the Asian-inspired martial arts genre.  It tells the

26   story of an enemy warrior who returns to a quiet village in a time of peace, to engage in

27   battle with a resident hero.  In the midst of the battle between the two characters, the by

28

15

United States District Court

For the Northern District of California

1  now familiar cell phone ringing is heard, and the characters' attention is turned to the

2  audience.  The enemy warrior takes advantage of the hero's inattention, and the hero is

3  vanquished.  Finally, the Pump Up the Movie spot tells an all-American cheerleading

4  underdog story, in which a young male cheerleader must overcome the skepticism of both

5  fellow cheerleaders and his father in order to realize his cheerleading ambition.  At a critical

6  moment during the national cheerleading championships requiring the young cheerleader's

7  attention, cell phone ringing is once again heard from the audience.  As all characters in the

8  spot turn to the audience, the young cheerleader's attention is distracted, and his team

9  collapses around him.

10      The sequence of events depicted in all four works in question are decidedly different.

11  The spots each tell different stories, with different characters, who are placed in different

12  situations.  To be sure, there are some commonalities.  All four spots, for example,

13  although they tell the different stories outlined above, contain a critical moment where those

14  story lines are interrupted with the ringing of a cell phone that appears to be coming from

15  the off-screen audience.  And in all four spots, the ringing of the cell phone disrupts the

16  varying story lines, to the detriment of the on-screen characters.  Identity Arts, while

17  recognizing that the story lines of the four works are "facially dissimilar," argues that the

18  true plot is actually defined by these similarities, rather than the differences.  Specifically,

19  plaintiff claims that the true storyline of the spots is "the story of a movie theater where the

20  movie is interrupted, and the real characters of the movie are adversely affected by a

21  patron's cell phone use."  See Best Buy I Opp. Br. at 10:7-10.

22      This, however, is unpersuasive.  In making this argument, plaintiff paints with far too

23  broad a brush stroke, and defines the plot of each work in an overly generalized way.

24  Indeed, plaintiff's definition of what the true plot is for each work more appropriately reads

25  as the general idea, or concept, of the works in question – which is the use of a cell phone

26  courtesy message designed to look like a real movie trailer – rather than the story lines.  As

27  for the actual *expression* of the fundamental idea in a story line sequence, however – i.e.,

28

United States District Court

For the Northern District of California

1  plot – the works are each distinctive and dissimilar, despite the presence of some

2  commonalities like the ringing cell phone and the interaction with the off-screen audience.

3  See, e.g., Shaw, 919 F.2d at 1356 ("[c]opyright law protects an author's expression; facts

4  and ideas within a work are not protected").

5      In sum, a comparison of the works in question demonstrates that, contrary to

6  plaintiff's contention, there is no substantial similarity in the plots of the works in question.

7  To the extent any similarity in plot exists, it is only at the general level for which plaintiff

8  cannot claim copyright protection.  See, e.g., Litchfield v. Spielberg, 736 F.2d 1352, 1357

9  (9th Cir. 1984).

10                          b.      theme

11     Generally speaking, 'theme' can be defined as the subject or topic of artistic

12 expression, a point of view embodied upon in a work of art, or even, as Identity Arts

13 asserts, as the "unifying or dominant idea" inherent in a given work.  See Best Buy I Opp.

14 Br. at 10:14-15; see also Webster's II New Riverside University Dictionary (1988).

15     Here, as with the element of plot, the works at issue prove to have distinct themes.

16 The Submarine spot evokes the themes of military warfare, danger, and impending death.

17 The Buffalo spot evokes the themes of tribal community, the hunt, and survival in the wild.

18 As for Return of the Kwan, its theme is that of the ancient warrior hero in peacetime who

19 must conquer his enemy in order to save his village.  Finally, Pump Up the Movie evokes

20 the theme of the underdog athlete who must overcome negative expectations and personal

21 challenge in order to realize his athletic dream.  None of these themes is substantially

22 similar to any other.

23     Identity Arts attempts to avoid this conclusion by looking once more for an

24 overarching theme capable of tying all spots together.  To that end, it states that the true

25 theme of the Submarine spot is really "that each and every moviegoer can be a 'hero,' and

26 can protect the well-being of those around them by refraining from cell phone use during

27 the movie," and that defendants' spots have the similar themes that "a failure to refrain from

28

17

United States District Court

For the Northern District of California

1    cell phone use during the movie can have disastrous results," or that "turning off cell phone

2    can 'save' the movie for all movie-goers."  See Best Buy I Opp. Br. at 10:14-16, 10:20-23.

3         Again, however, as noted in connection with analysis of the plot element, plaintiff

4    urges too broad a definition.  While plaintiff is correct that the overall message that all the

5    various spots seek to convey is that cell phone users should refrain from cell phone use

6    during movie showings, this message is part of the overall concept and *idea* for the spots,

7    which is that of a cell phone courtesy message designed to masquerade as a real movie

8    trailer, rather than being expressed as the central theme present in each work.  More

9    fundamentally, the message that every movie goer can be a "hero" by turning off their cell

10   phones, simply does not rise to the level of an "actual concrete element[] that make[s] up

11   the total sequence of events and the relationships between the major characters."  See,

12   e.g., Metcalf v. Bochco, 294 F.3d 1069, 1074 (9th Cir. 2002).

13        In sum, even though there may be some commonalities in the overall idea and

14   concept that are expressed by the varying themes, there is no substantial similarity of

15   actual theme between the various works in question.

16                      c.    dialogue

17        Identity Arts contends that there are three substantial similarities apparent in the

18   dialogue that takes place in all four works in question: first, the existence of

19   "asynchronism," that is, sound that does not originate from the environment depicted on

20   screen.  Identity Arts specifically points to the ringing cell phone as proof of asynchronism.

21   Second, all works exhibit the "breaking of the fourth wall" – i.e., the use of dialogue

22   between the on-screen characters and the audience.  Finally, Identity Arts claims that the

23   catch phrases "it's coming from the audience," or in the alternative, "it's coming from the

24   theater," are also elements of dialogue similar to all works.

25        Plaintiff is correct that there are some similarities present in the dialogue of each

26   spot.  Specifically, as plaintiff highlights above, most striking is the dialogue in each spot

27   that corresponds with the moment where the sound of an off-screen ringing cell phone is

28

18

heard by the on-screen characters of the spots.  In the Submarine spot, the cell phone

ringing is heard, and a member of the crew says to the rest of the crew members that the

sound is "coming from the audience."[5]  In the Buffalo Spot, one hunter says to the other

upon hearing the ringing cell phone, "it's coming from the audience."  In Return of the

Kwan, which is subtitled, dialogue appears in written format throughout, with the villain

stating "it's coming from the audience" in response to the ringing phone and the hero's

question, "did you hear that?"  Finally, in Pump Up the Movie, an on-screen character

changes the dialogue slightly when he states, "it's coming from the theater" after the sound

of the ringing cell phone is heard.

These similarities, however, do not rise to the level of <u>substantial</u> similarity.  To begin

with, the sound of the ringing cell phone itself cannot be classified as dialogue, and plaintiff

presents no authority for holding that such a sound, even though present in all works at

issue, is protectable.  Nor does plaintiff present any support for why the court should hold

that the "breaking of the fourth wall" constitutes substantially similar dialogue.  To the

contrary, the breaking of the fourth wall is a cinematic technique, not dialogue.  This leaves

the court with the most striking – and only – true similarity in dialogue present: use of the

phrase "it's coming from the [audience/theater]."  As to this phrase, however, there can be

no copyright protection.  <u>See, e.g., Narell v. Freeman</u>, 872 F.2d 907, 911 (9th Cir.

1989)("Ordinary phrases are not entitled to copyright protection."); <u>see also</u> 37 C.F.R. §

202.1(a)(words and short phrases are not subject to copyright).

Moreover, despite the presence of the above similarities in all spots, these

similarities appear in the context of many *differences* in dialogue that are present in the

spots.  Since the story lines of each plot are widely divergent, so too, is the dialogue.

Neither the characters' statements, nor the spot announcer's statements is the same in any

---

[5]     The court was unable to distinguish this phrase audibly in the dvd version of the
Submarine spot, submitted as Exhibit C to the Best Buy I SAC.  However, since both parties
appear to concede the existence of this phrase in the Submarine spot, the court treats the
presence of the phrase as a conceded fact for purposes of this motion.

19

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1 of the spots, with the exception of the single phrase, "it's coming from the

2 [audience/theater]," which has been demonstrated above to fall outside the scope of

3 copyright protection.

4        As such, the court can find no substantial similarity of dialogue present in the spots

5 before it.

6                        d.        mood

7        Identity Arts defines "mood" as referring to the "prevailing emotional tone or general

8 attitude" exhibited in a given work.  According to plaintiff, the prevailing emotional tone of all

9 four works in question here is best described as "tense," and results from the "fear of

10 impending doom or failure that faces each apparent central character."  See Best Buy I

11 Opp. Br. at 11:16-17.  Defendants, by contrast, contend that the mood for each spot is

12 dramatically different.  In Submarine, the feeling is one of "suffocating claustrophobia inside

13 a ship and the threat of imminent death."  In Buffalo, the tone is one that "reflects the risk of

14 slow starvation in the wide-open wilderness."  Return of the Kwan exhibits a tone of "one-

15 on-one, hand to hand martial arts surrealism," while Pump Up the Movie portrays a "light-

16 hearted" mood.

17        Defendants read the mood of the spots in question better than plaintiff.  Each spot,

18 which tells a different story and uses different characters in order to tell the story, also

19 carries with it a distinctive mood – i.e., emotional tone.  The mood of the Submarine spot is,

20 as plaintiff portrays it, very tense, hair-raising, and suspenseful.  The Buffalo, however, is

21 best described as serious, mournful, and dramatic.  Return of the Kwan conveys an action-

22 packed mood on the scale of an Asian epic film.  Finally, Pump Up the Movie can best be

23 described as conveying a light-hearted mood typical of many coming-of-age sports movies.

24        In sum, the court cannot find any substantial similarity of mood, as exhibited in each

25 work before the court.

26                        e.        setting

27        As plaintiff notes, "setting" refers to the "scene" in which the works at issue take

28

place.  Plaintiff contends that here, there are *two* relevant settings: an actual setting, and an intentionally false setting.  The actual setting is the movie theater in which the spots are playing, and plaintiff points out that this is identical in all four works at issue.  As for the intentionally false setting, plaintiff acknowledges that it varies depending on the spot at issue (e.g., submarine ship, wilderness, cheerleading competition), but contends that the *use* of a false setting in all works is substantially similar.

Even taking at face value plaintiff's argument that there are two settings at issue with regard to each work, plaintiff cannot demonstrate substantial similarity among the spots.  Plaintiff first claims, for example, that the true setting of each work is the movie theater in which the spot is shown.  However, this cannot be; the concept of a work's setting refers to the place described by the work itself.  Here, this means the setting exhibited in the story lines themselves, and in the sequence of events that take place within the story line – i.e., the submarine ship, the American wilderness, the Asian village and lake, and the cheerleading competition.  If the court were to follow plaintiff's urging and define the actual setting of the spots in question with reference to any given movie theater in which the spots are shown, the line between an artistic performance or showing, and the audience for whom those performances and showings are made, would become meaningless.

Moreover, there is no authority that the court has found that would sanction such an approach, and allow or require the court to objectively analyze the element of setting with respect to the actual place in which a work is exhibited.  Indeed, to the extent the Ninth Circuit has even considered the setting element with respect to the location in which a work was filmed, it has said that any similarities among film location is "generic and inconsequential" such that it would "fail to meet substantial similarity."  See Rice v. Fox Broadcasting Co., 330 F.3d 1170, 1176-77 (9th Cir. 2003).  So, too, here.  To the extent, therefore, that plaintiff argues that the true setting is the actual movie theater in which the spots are shown, and that all four spots are substantially similar in this regard, the court

United States District Court

For the Northern District of California

1    rejects plaintiff's argument.

2            This leaves plaintiff with the argument that there are substantial similarities with

3    respect to the intentionally false setting exhibited in all four spots.  With respect to this

4    argument, however, plaintiff itself fails to quarrel with the widely divergent settings apparent

5    in the spots.  As such, plaintiff concedes the lack of substantial similarity with respect to any

6    protectable elements demonstrating setting among the works in question, and the court

7    further holds that no substantial similarity is present.

8                                f.        pace

9            Identity Arts argues that the pace of each work before the court is identical, since the

10   pace is intentionally set to "create the look and feel of a movie trailer," "facilitate the

11   montage sequence of events," and "foster the tense mood and apparent conflict."  <u>See</u>

12   Best Buy I Opp. Br. at 13:12-15.  Defendants concede that all spots do have in common

13   the element of pace, as each is approximately 35 to 45 seconds in length.  They assert,

14   however, that this similarity in pace is merely a function of the fact that all spots are

15   presented as movie trailer, which have time restrictions that forcibly limit all spots to similar

16   pace.

17           As both parties note, all spots before the court do, indeed, maintain a similar pace.

18   However, contrary to plaintiff's argument, these similarities are common to any movie

19   trailer, as all movie trailers are necessarily limited in time, as defendants point out.  It

20   follows, therefore, that any similarity in pace among the spots at issue here is a similarity

21   that is necessarily derived from and a function of the use of the *idea* of displaying cell

22   phone courtesy messages disguised as real movie trailers.  As such, the idea of faux movie

23   trailers, and the 35 to 45 second pace that results from the expression of that idea, are

24   merged, such that any substantial similarity among this element is unprotectable under the

25   copyright laws.  <u>See Rice</u>, 330 F.3d at 1175 ("similarities derived from the use of common

26   ideas cannot be protected; otherwise, the first to come up with an idea will corner the

27   market").

28

                                         22

United States District Court

For the Northern District of California

1    In short, the court does not find any substantial similarity with regard to pace, in

2    connection with the works in question.

3                              g.      characters

4    Identity Arts points out that the most important character in all four works is the "in-

5    theater movie patron who fails to silence his/her cell phone before the movie begins."  See

6    Best Buy Opp. Br. at 11:23-25.  This off-screen character is the sole basis upon which

7    plaintiff argues that there is substantial similarity of characters in all four works.  To the

8    extent that defendants respond by highlighting the obvious presence of numerous varying

9    on-screen characters in the four spots in question, plaintiff dismisses these on-screen

10   characters as incidental and secondary to the true off-screen character of each work.

11   Plaintiff cannot claim substantial similarity based on the presence of an amorphous,

12   unidentified, and undefined off-screen character.  To begin with, in order for there to be

13   copyright protection over the similarities present in two or more characters, plaintiff must

14   first be able to demonstrate what the similarities and attributes shared by the characters

15   are.  See, e.g., Rice, 330 F.3d at 1176 (analyzing character element of extrinsic test with

16   regard to the "shared attributes of appearance and ... demeanor").  Here, however, plaintiff

17   has not sufficiently identified the central off-screen character by attribute or demeanor, or

18   any other characteristic that would allow the court to extend copyright protection under this

19   element.  Indeed, to the extent that plaintiff relies on the general presence of an off-screen

20   audience member as a character in any of the spots, plaintiff is really seeking copyright

21   protection for similarities in characters who are generic and common to all off-screen

22   audience members as a rule of thumb.  These generic attributes are not protectable.  See

23   id. ("generic and common attributes" to stock characters not protectable).

24   Second, even if such a character were protectable, plaintiff cannot merely sweep

25   aside the presence of so many other varied characters who appear in the differing spots,

26   and whose attributes and demeanor bear no similarity with one another.  For example, the

27   submarine crew depicted in the Submarine spot bear no resemblance with or likeness to

28

23

United States District Court
For the Northern District of California

1  the Native American tribal members seen in the Buffalo.  Nor do they bear any

2  resemblance to either the hero and villain portrayed in Return of the Kwan, or the young

3  cheerleader in Pump Up the Movie.  Accordingly, a review of all the characters who *are*

4  identifiable and concrete, demonstrate that no substantial similarity is present among them.

5      Accordingly, the court finds that plaintiff cannot demonstrate substantial similarity of

6  characters in connection with the spots at issue.

7                    h.    sequence of events

8      Finally, Identity Arts claims that there is a concrete and unique sequence of events

9  that is present in the Submarine Spot, as well as in defendants' three works.  First, the

10  sequence of events is unique, as it is displayed as "a collection of rapidly edited images, to

11  mirror the look and feel of a movie trailer."  Second, Identity Arts claims that the sequence

12  of events is displayed in "filmic time" – i.e., in a non-chronological order.  Third, the

13  sequence of events in all works is identical, involving: title cards, interspersed with black

14  screens; the introduction of a false scene with on-screen characters; introduction of a false

15  conflict, with on-screen characters who attempt to overcome that conflict; the moment

16  where the success of the on-screen character is prevented due to a ringing cell phone; and

17  the introduction of the central, off-screen character, and the revelation of the true nature of

18  the spot as a courtesy message for patrons.  See Best Buy I Opp. Br. at 12:6-14.

19  Defendants, by contrast, point to this sequence of events as a description of generic

20  elements for which copyright protection cannot be invoked.

21      Defendants are correct.  The sequence of events that plaintiff describes is not

22  sufficiently unique or concrete enough to warrant copyright protection.  Rather, plaintiff

23  once more defines the scope of copyright protection too broadly, and impermissibly seeks

24  protection for the general idea, or concept, of a faux movie trailer whose true nature is a

25  cell phone courtesy message, instead of seeking protection for plaintiff's own *expression* of

26  the same idea.  See, e.g., Berkic v. Chricton, 761 F.2d 1289, 1293 (9th Cir. 1985)

27  ("[g]eneral plot ideas are not protected by copyright law; they remain forever the common

28

24

United States District Court
For the Northern District of California

1  property of artistic mankind.").  For example, plaintiff seeks protection for the collection of

2  "rapidly edited images" that mirror the look of a movie trailer, for the fact that the sequence

3  of events is displayed in "filmic" time, for the use of title cards and black screens, and for

4  the introduction of on-screen characters and the use of dramatic elements to create conflict

5  and a final result of that conflict.  These, however, are generic elements and scenes that

6  flow naturally from the basic plot premise of a cell phone courtesy message disguised as a

7  movie trailer.  As such, they are unprotected scenes a faire.  See, e.g., Metcalf, 294 F.3d at

8  1074 (copyright law does not protect "scenes a faire, or scenes that flow naturally from

9  unprotectable basic plot premises").  Nearly every movie trailer, for instance, involves the

10  use of rapidly edited images displayed in filmic time, along with the use of title cards, and

11  sufficient introduction of the storyline so as to leave an impression of the story in the

12  viewer's mind.

13       To the extent that plaintiff also points to substantial similarities in the sequence of

14  events that do not necessarily invoke the doctrine of scenes a faire – for example, use of

15  the ringing cell phone, and interaction with the off-screen audience character – these

16  similarities are not substantially similar warranting copyright protection, as discussed

17  above.

18       Accordingly, as with the elements discussed above, the sequence of events invoked

19  by plaintiff cannot, standing alone, support a finding of substantial similarity, when

20  compared with the works in question.  They are either too generic, or constitute scenes a

21  faire.

22       In sum, therefore, after engaging in analysis of all four works in question under the

23  Ninth Circuit's extrinsic test, the court concludes that no substantial similarity exists over

24  protectable elements of plaintiff's work.  While it is true enough that there is a certain

25  similarity in overall concept and idea – i.e., that all spots are faux movie trailers that show a

26  plot interrupted by a ringing cell phone coming from the audience – the actual specific

27  details of the spots themselves are not substantially similar, nor is their expression of the

28

**United States District Court**
For the Northern District of California

1   underlying idea sufficiently similar.  The spots use different individual story plots, themes

2   and settings, different characters, and a different sequence of events.  To the extent that

3   similarities exist, they are too generic to qualify for protection, or otherwise unprotectable

4   (e.g., scenes a faire).  As such, any conclusion that substantial similarity between the spots

5   is present would defy the Ninth Circuit's exhortation that copyright law protects only the

6   *specific* details of an author's rendering of an idea, and not the idea itself.

7       This conclusion is buttressed by the fact that – as noted above – this court has

8   reached this same conclusion once before, in connection with the plaintiff's earlier motion

9   for preliminary injunction.  There, the court compared the same spots (although only the

10  Submarine spot script had been properly registered), and held that plaintiff did not have a

11  high likelihood of success in proving substantial similarity.  In connection with that motion,

12  the court also rejected plaintiff's proffered expert testimony – a declaration submitted by Mr.

13  Robert Viannello.  To the extent, therefore, that plaintiff has attempted to rely on Mr.

14  Viannello's testimony once again here, the court also rejects it, in light of the fact that

15  plaintiff has submitted *the exact same Viannello declaration* before the court that was

16  submitted and rejected earlier.

17      Finally, the court briefly takes note of, and dismisses, two additional arguments that

18  plaintiff makes in a vain attempt to avoid the court's inevitable conclusion with respect to

19  infringement.  First, plaintiff argues that it is the combination of all elements that warrants

20  protection, even if the individual elements themselves are not protectable.  For support,

21  plaintiff relies on this court's decision in Open Source Yoga Unity v. Bikram Choudhury,

22  2005 WL 756558 (N.D. Cal. 2005), as well as the 2nd Circuit's decision in Matthew Bender

23  v. West Publishing Co., 158 F.3d 674 (2d Cir. 1988).  Plaintiff's argument, however, fails.

24  In Open Source Yoga, the court assumed without deciding, that if substantial similarity

25  were found at trial, infringement of the very specific yoga sequences at issue would occur,

26  even though the poses in and of themselves may not be subject to copyright protection.

27  But the court stated that such infringement would occur assuming that the identical

28

United States District Court
For the Northern District of California

1    sequences had been copied (providing only a thin copyright protection), and further found

2    that a conclusion of infringement was inappropriate at the summary judgment stage.  See

3    Open Source Yoga, 2005 WL 756558 at *4-5.  Here, by contrast, as has been discussed

4    above, there is *no* identical duplication in any of defendants' spots, of the same plot or

5    elements contained in the Submarine spot.  Nor is there any specifically identifiable

6    sequence that can even be protected, as many of plaintiffs' elements are either stock

7    elements, or simply too generic to merit protection, regardless of their specific combination.

8    Accordingly, there is simply no principle stated in Open Source Yoga that is either helpful or

9    persuasive to plaintiff's case.

10        The same is true of plaintiff's reliance on Matthew Bender, wherein the Second

11   Circuit considered the issue of a written compilation of material related to a case law

12   publishing service.  While plaintiff is correct that the Second Circuit found that sufficient

13   creativity in arrangement of a compilation could support an infringement claim, the case

14   dealt with written compilations only, where the actual underlying information of both works

15   in question was indisputably identical (i.e., written information relating to case names,

16   attorney names, etc.).  Here, by contrast, as just stated, there is no underlying group of

17   elements or source of information in the Submarine spot that is plainly identical to the other

18   three spots in question, with the exception of the phrase "it's coming from the audience" (a

19   phrase which has already been held insufficient to support an infringement claim).  There

20   is, therefore, no basis upon which to place this case into the same category as Matthew

21   Bender and conclude that infringement has taken place on a compilation basis.

22        Second, plaintiff makes the procedural argument that it is entitled to application of

23   the inverse ratio rule here, pursuant to which plaintiff would be entitled to a lower standard

24   of proof on the issue of substantial similarity.  See, e.g., Three Boys Music Corp. v. Bolton,

25   212 F.3d 477, 485 (9th Cir. 2000)("we require a lower standard of proof of substantial

26   similarity when a high degree of access is shown"). To this, however, the court responds,

27   as defendants point out, that "no amount of proof of access will suffice to show copying if

28

27

United States District Court

For the Northern District of California

1   there are no similarities."  <u>See Funky Films</u>, 462 F.3d at 1081.  Accordingly, having

2   concluded here that no substantial similarities exist such that copyright protection attaches

3   to plaintiff's work, plaintiff is not entitled to the benefits of the inverse ratio rule.

4        In conclusion, defendants are correct that plaintiff cannot show substantial similarity,

5   and plaintiff's inability to do so – and in view of plaintiff's prior attempts to amend the

6   complaint – warrants entry of judgment on the pleadings in defendants' favor with respect

7   to plaintiff's first three causes of action.

8             3.        License Agreement

9        Even if the court were not persuaded that no substantial similarity exists between

10   plaintiff's spot and defendants' spots, the Best Buy defendants argue that the license

11   agreement between the parties specifically allows defendants to make the faux movie

12   trailers in question, thereby preventing a finding of infringement.  Plaintiff, for its part,

13   concedes that the license agreement between the parties does not prohibit defendants

14   from producing their own courtesy message commercials, but asserts that this is different

15   from a grant of express authorization to do so, and further asserts that extrinsic evidence

16   will prove that defendants lacked authorization to prepare the works in question to the

17   extent based on the Submarine spot.

18        Even if the court had not already concluded that the works in question are not

19   substantially similar, it would conclude that the license agreement does, on its face, grant

20   defendants the right to produce the three works at issue.  The license agreement – the

21   validity of which plaintiff apparently concedes – is explicit on its face.  <u>See</u> Best Buy I SAC,

22   Ex. B. at ¶ 5.  It expressly states that, while plaintiff owns all copyright in the Submarine

23   Spot, "Nothing in this Agreement shall preclude Licensee from producing its own or

24   licensing from third parties courtesy message commercials using a theatrical motion picture

25   trailesque theme or style."  <u>Id</u>.  This is an express statement giving the Best Buy

26   defendants the right to produce its own faux movie trailer commercials.  Since this is

27   precisely what the Buffalo, Return of the Kwan, and Pump up the Movie spots are, then it

28

United States District Court

For the Northern District of California

1  follows that defendants were granted the right to make them.

2         Plaintiff invokes the well-established rule that "copyright licenses are assumed to

3  prohibit any use not authorized," in an attempt to argue that the Agreement must be

4  construed as *prohibiting* defendants from creation and use of their spots.  See S.O.S., Inc.

5  v. Payday, Inc., 886 F.2d 1081, 1088 (9th Cir. 1989).  Plaintiff contends that this must be

6  so, since the language of the Agreement is not phrased in affirmative granting language,

7  but rather in negative language that merely states that defendants 'shall not be precluded'

8  from creating and using its own faux movie trailers.

9         The court finds plaintiff's arguments unpersuasive in this regard.  Contrary to

10  plaintiff's position, the Ninth Circuit in SOS did not find that language in a licensing

11  agreement conveying authorization for use cannot constitute authorization unless

12  expressed in affirmative language.  It simply recognized the rule that, unless an agreement

13  expressly grants authorization for use – *regardless* of the language in which the express

14  authorization is couched – the agreement will not be construed as doing so.  Here,

15  although the Agreement between the parties does not use affirmative language in granting

16  defendants the right to "produc[e] its own ... courtesy message commercials using a

17  theatrical motion picture trailesque theme or style," it is nonetheless clear that plaintiff

18  granted defendants the right to use a movie trailer format with a theme or style similar to

19  plaintiff's Submarine spot.  This includes spots such as Buffalo, Return of the Kwan, and

20  Pump Up the Movie.

21         Even, assuming arguendo, that the court narrowly construes the Agreement as

22  granting defendants the limited right to produce movie trailers that use only the same literal

23  "theme" elements as the Submarine spot – and no other elements similar to the Submarine

24  spot  – this is still not enough to save plaintiff's copyright claims.  For even if the Agreement

25  only authorized defendants to use a similar theme in their spots, plaintiff would still be

26  required to demonstrate substantial similarity as to the other seven elements evaluated

27  under the extrinsic test, in order to state a valid claim for copyright infringement (e.g., plot,

28

United States District Court

For the Northern District of California

1  dialogue, mood, setting, pace, characters, and sequence of events).  And as the court

2  explicitly found above, plaintiff has not done, and cannot do so.  As such, plaintiff has failed

3  to demonstrate that it can state a claim for copyright infringement, whether the Agreement

4  is construed more broadly as explicitly granting to defendants the right to produce similar

5  cell phone movie trailers, or is more narrowly construed as granting defendants the limited

6  right to produce only similarly 'themed' spots.

7       Furthermore, given that the terms of the Agreement are express and unambiguous,

8  plaintiff shall not be allowed to introduce any extrinsic evidence that contradicts the

9  agreement.  See A. Kemp Fisheries, Inc. v. Castle & Cooke, Inc., 852 F.2d 493, 495 (9th

10  Cir. 1988)("[E]xtrinsic evidence is not admissible to add to, detract from, or vary the terms

11  of a written contract.").

12       In sum, therefore, both the law and the Agreement warrant judgment on the

13  pleadings in defendants' favor with respect plaintiff's first three claims.

14               4.       Preemption of State Law Claims

15       Defendants next turn to plaintiff's three state law claims for unfair competition,

16  breach of implied contract, and unjust enrichment, and assert that all are preempted.

17       The Copyright Act preempts state law if two conditions are met.  The work of

18  authorship must fall within the subject matter of the Copyright Act 17 U.S.C. § 102 ("subject

19  matter"), and the rights that the state law protects must be equivalent to those protected by

20  the Copyright Act, specified in 17 U.S.C. § 106 ("equivalent").  Kodadek v. MTV Networks

21  Inc., 152 F.3d 1209, 1212 (9th Cir. 1998); see also Downing v. Abercrombie & Fitch, 265

22  F.3d 994, 1003 (9th Cir. 2001).

23       The court has considered preemption in the context of this case before.  In February

24  2006, the court ruled on defendants' motion to dismiss plaintiff's claims for unfair

25  competition and unjust enrichment, and found that they were preempted by the Copyright

26  Act.  The court granted leave to amend the complaint, so that plaintiff could try and allege

27  its marketing strategy as the necessary extra element that would allow its state law claims

28

United States District Court

For the Northern District of California

1    to fall outside the ambit of the Copyright Act.  Plaintiff did so, and added a third breach of

2    implied contract claim.

3          The question now before the court is whether the additional allegations regarding

4    plaintiff's marketing strategy save plaintiff's state law claims from preemption.  As plaintiff

5    did previously, it bases all three claims on the same allegations that form the basis for its

6    copyright claims, stating that the Best Buy defendants wrongfully used material protected

7    by the US Copyright laws, and which belonged to Identity Arts.  See, e.g., Best Buy I SAC

8    at 21-28.  Now, however, plaintiff has included allegations related to its marketing strategy.

9    Specifically, plaintiff alleges:  the fact that it had a marketing strategy; the fact that plaintiff

10   provided defendants with its marketing strategies; that plaintiff had a reasonable belief that

11   it would be compensated for providing defendants with knowledge of its marketing strategy;

12   and that the strategy was inappropriately taken and used by defendants.  See id.

13         With respect to plaintiff's fourth cause of action for unfair competition pursuant to

14   California Business & Professions Code § 17200 et seq., and plaintiff's sixth cause of

15   action for unjust enrichment, plaintiff's additional allegations do not save the claims from

16   preemption.  This is because plaintiff's allegations continue to incorporate references from

17   plaintiff's copyright claims, and continue to be expressly based upon the material covered

18   by plaintiff's copyright claims.  Indeed, even plaintiff's marketing strategy, as alleged in both

19   causes of action, is alleged as a "strategy to market material protected by [plaintiff's

20   copyrighted works]."  See Best Buy I SAC, ¶¶ 134, 161.  In short, there is no real distinction

21   between the marketing strategy that plaintiff alleges was taken improperly, and the

22   copyrightable material that plaintiff alleges was infringed.  As such, the court concludes that

23   plaintiff improperly seeks protection of his copyrighted works through its fourth and sixth

24   state law claims, and those claims are hereby preempted.  See Kodadek, 152 F.3d at

25   1212-13 (holding § 17200 claim preempted by Copyright Act); see also Del Madera Props.

26   v. Rhodes & Gardner, 820 F.2d 973 (9th Cir.1987)(holding unjust enrichment claim alleging

27   "misappropriation" preempted by Copyright Act), overruled on other grounds in Fogerty v.

28

United States District Court

For the Northern District of California

1  Fantasy, Inc., 510 U.S. 517 (1994).

2       With respect to plaintiff's fifth cause of action for breach of implied contract,

3  however, the court does not find the claim preempted, for plaintiff's allegations are sufficient

4  to set forth a Desny claim.  See Desny v. Wilder, 46 Cal. 2d 715, 739 (1956).  In Desny, the

5  court allowed an implied breach of contract claim to go forward in connection with federal

6  copyright claims, on the basis that a promise to pay reasonable compensation for an "idea"

7  that is otherwise not protectable under copyright law can be the basis for the state law

8  claim.  The Ninth Circuit has endorsed Desny claims, holding: "To establish a Desny claim

9  for breach of implied-in-fact contract, the plaintiff must show that the plaintiff prepared the

10  work, disclosed the work to the offeree for sale, and did so under circumstances from which

11  it could be concluded that the offeree voluntarily accepted the disclosure knowing the

12  conditions on which it was tendered and the reasonable value of the work."  See Grosso v.

13  Miramax Film, 383 F.3d 965, 967 (9th Cir. 2004)(holding Desny claim was stated where

14  plaintiff alleged that "idea" in question "was submitted by Plaintiff to Defendants with the

15  understanding and expectation, fully and clearly understood by Defendants that Plaintiffs

16  would be reasonably compensated for its use by Defendants").

17       Here, plaintiff's claim for breach of implied contract sufficiently alleges the extra

18  element of an implied promise to pay for the ideas inherent in the Submarine spot, such

19  that preemption is avoided for purposes of this motion.  See Best Buy I SAC, ¶ 151.

20  Plaintiff is entitled, as are defendants, to develop the factual record further through

21  discovery, and the issue may be raised again at the summary judgment phase.

22       In conclusion, the court GRANTS defendants' motion for judgment on the pleadings

23  with respect to plaintiff's fourth and sixth causes of action on preemption grounds, and

24  DENIES the motion with respect to plaintiff's fifth cause of action.

25            5.     Merits of State Law Claims

26       In view of the court's decision to grant judgment on the pleadings in favor of

27  defendants with respect to plaintiff's fourth and sixth causes of action, the court need not,

28

United States District Court
For the Northern District of California

1   and does not, reach the parties' arguments with respect to the merits of those state law

2   claims.

3          With respect to plaintiff's fifth cause of action for breach of implied contract,

4   however, defendants assert that the claim should be dismissed for reasons other than

5   preemption.  Specifically, defendants contend that the claim should be dismissed because

6   (a) plaintiff lacks standing to assert claims for idea misappropriation; (b) the parties'

7   licensing agreement grants defendants the right to use the marketing strategy; and (c) the

8   claim is barred by the statute of limitations.

9                              a.      standing

10         The Best Buy defendants contend that plaintiff lacks standing to allege any claim

11  based upon its purported marketing strategy, since the marketing strategy belongs to Mr.

12  Janssen, not plaintiff Identity Arts, and plaintiff nowhere alleges that Mr. Janssen ever

13  transferred to Identity Arts any interest in the marketing strategy.

14         As plaintiff points out, however, the SAC alleges that in August 2002, Mr. Janssen

15  helped found Identity Arts and simultaneously transferred "all his legal rights in material

16  protected by [the copyright for the Submarine spot script]" to the new company.  See Best

17  Buy I SAC ¶ 23.  The SAC also alleges that Mr. Janssen assigned any and all of his

18  remaining rights in material protected by the copyright for the Submarine spot itself, in

19  February 2006.  See id. at ¶ 73.  The court finds these allegations sufficient to allege

20  plaintiff's standing to sue for breach of implied contract with respect to plaintiff's marketing

21  strategy, which is based in part on the copyrighted material of the Submarine spot script,

22  and the Submarine spot.

23         Accordingly, the court declines to find that plaintiff lacks standing with respect to is

24  claim for breach of implied contract.

25                              b.      licensing agreement

26         Next, defendants assert that plaintiff cannot base its claim for breach of implied

27  contract on the alleged marketing strategy, because the Licensing Agreement between the

28

United States District Court
For the Northern District of California

1  parties expressly grants defendants the right to use plaintiff's marketing strategy.

2  Accordingly, defendants argue, plaintiff should be estopped here from bringing an action

3  based on allegations that contradict the express terms of the Agreement.

4  Defendants' argument is unpersuasive.  Defendants presume that the Agreement's

5  provisions dealing with "cell phone courtesy message commercials," and authorizing

6  defendants to produce their own "message commercials using a theatrical motion picture

7  trailesque theme or style," are tantamount to provisions dealing with – and authorizing use

8  of – plaintiff's alleged marketing idea.  See Best Buy I SAC, Ex. B at §§ 1, 4,  5.  However,

9  this argument artificially limits plaintiff's alleged marketing strategy to a narrow definition

10  that extends only to "courtesy message commercials using a theatrical motion picture

11  trailesque theme or style," without any justification for doing so.  Indeed, all indications in

12  the second amended complaint are that plaintiff has not limited its alleged marketing

13  strategy in such a way.  Plaintiff alleges only that the marketing strategy was one that

14  involved marketing "the Submarine Spot to cell phone manufacturers, cell phone service

15  providers and movie theatre chains, for use as advertising space," and that the strategy in

16  part covered "material protected by the [copyright registrations]."  See Best Buy I SAC, ¶¶

17  26, 150.  Accordingly, while plaintiff's alleged marketing strategy may include courtesy

18  message commercials using a theatrical motion picture trailesque theme or style, it does

19  not follow from plaintiff's allegations that the two are synonymous.

20  In sum, it does not follow that the Agreements' provisions explicitly address plaintiff's

21  alleged marketing strategy, nor does it follow that plaintiff should accordingly be estopped

22  by virtue of the Agreement from raising a claim for breach of implied contract based on the

23  alleged marketing strategy.  Judgment on the pleadings with regard to plaintiff's claim for

24  breach of implied contract is therefore DENIED on these grounds.

25  c.      statute of limitations

26  Finally, the Best Buy defendants argue that plaintiff's claim for breach of implied

27  contract is barred because plaintiff failed to bring the claim within the applicable two-year

28

34

United States District Court

For the Northern District of California

1   limitations period.  See Cal. Civ. Proc. Code § 339(1).  Defendants assert that plaintiff knew

2   that defendants were using its alleged marketing strategy with third parties as of October

3   2003, when the Licensing Agreement between the parties was executed and the final

4   Submarine spot was delivered to defendants.  See Best Buy I SAC, Ex. B.  However,

5   plaintiff did not file the instant action until November 2005, more than two years later.  As

6   such, defendants contend that the claim is untimely.

7        Defendants' argument is unpersuasive.  Plaintiff's claim for breach of implied

8   contract accrued at the time of defendants' breach.  See Menefee v. Ostawari, 228 Cal.

9   App. 3d 239, 245-46 (1991)("a cause of action for breach of contract ordinarily accrues at

10  the time of breach regardless of whether any substantial damage is apparent or

11  ascertainable"); In re Estate of Fincher, 119 Cal. App. 3d 343, 352 (1981) ("The general

12  rule is that a suit for breach of an implied agreement accrues at the time of the breach").

13  Here, plaintiff alleges that defendants' breach occurred when they "misappropriat[ed] and

14  us[ed] the marketing concepts, the Rough Cut Submarine Spot, the Submarine Spot and

15  thereby also the Original Elements and material protected [by plaintiff's copyright]."  Best

16  Buy I SAC, ¶ 157.  As for the date upon which this misappropriation and use actually

17  occurred, plaintiff alleges, contrary to defendants' contention, that defendants' unauthorized

18  use of the Submarine Spot in conjunction with third parties occurred "sometime prior to July

19  2004" – the time around which defendants began airing the three purportedly infringing

20  spots.  See id. at ¶ 48.  Accordingly, the court concludes that plaintiff has sufficiently

21  alleged that breach occurred in or about July 2004.  This brings plaintiff's action well within

22  the two year statute of limitations period applicable to the instant claim.

23       Moreover, where, as here, a plaintiff is alleging a breach of implied contract in

24  connection with misappropriation of an idea connected with copyrighted material, the Ninth

25  Circuit has held that the "latest date upon which [a plaintiff's ]breach-of-contract claim[]

26  could have accrued" is the date of defendants' airing of the challenged material.  See, e.g.,

27  Kourtis v. Cameron, 419 F.3d 989, 1000 (9th Cir. 2005)(plaintiff's implied breach of contract

28

35

United States District Court
For the Northern District of California

1  claim time-barred where filed more than 10 years after defendant's airing of allegedly

2  infringing material).  Here, this means that the latest date upon which plaintiff's claim for

3  breach of implied contract could have accrued is the date of defendants' airing of the three

4  spots in question – the Buffalo, Return of the Kwan, and Pump Up the Movie spots.  And

5  since the date of defendants' airing of each of the spots in question is not apparent from

6  the face of plaintiff's complaint, the court requires more information before it can

7  affirmatively rule in defendants' favor regarding the applicable statute of limitations.

8       In sum, the court concludes that plaintiff has sufficiently alleged a timely claim for

9  breach of implied contract for purposes of the instant motion.  Judgment on the pleadings

10  with regard to plaintiff's claim for breach of implied contract is therefore DENIED on

11  timeliness grounds.

12       C.    Best Buy II

13       The three motions filed by the defendants in Best Buy II largely make overlapping

14  arguments, and are considered together.  In sum, all defendants challenge plaintiff GJP's

15  two claims for federal copyright infringement.  Only the Best Buy and Sprint defendants,

16  however, challenge GJP's two state law claims.  As such, and since the parties respectively

17  raise nearly identical arguments, analysis of all motions boils down to (1) the validity of

18  GJP's federal copyright claims, and (2) the validity of GJP's two state law claims.

19            1.    Federal Copyright Claims

20       GJP brings its first copyright infringement claim against all defendants for

21  infringement of GJP's Phone Bomb spot, and brings its second copyright infringement

22  claim against all defendants except Identity Arts, for infringement of GJP's Action Fighter

23  spot.  All defendants seek judgment on the pleadings on the basis that there is no

24  substantial similarity among the spots in question.

25       In determining the issue of substantial similarity, the court relies on the legal

26  principles already enunciated in connection with the Best Buy I motion, and applies the

27  extrinsic test established by the Ninth Circuit.  In doing so, the court concludes, as stated

28

United States District Court

For the Northern District of California

below, that as was the case in connection with the Best Buy I motion, the works in question

here also reflect a lack of substantial similarity.

a.     plot

Phone Bomb/Submarine spots.  First, the court turns to a comparison of plot

between the Phone Bomb spot and the Submarine spot.  The Phone Bomb spot tells the

story of a military-style crew located inside a barracks-like atmosphere, who are called

upon to diffuse a bomb.  At the crucial moment requiring silence, the actions on screen are

interrupted by a ringing cell phone, which leads to the crew's demise.  The Submarine spot,

as the court has already noted, tells the story of a submarine crew whose silent descent in

what appear to be hostile conditions is suddenly interrupted by the sound of a ringing cell

phone coming from an off-screen audience.  As the crew urgently turns to the audience

and attempts to silence the sound, the ringing destroys the silence on screen and dooms

the crew.

Both spots have some undeniable similarities in plot.  For example, both tell the

story of a military operation and a crew, which operation is interrupted at a tense moment

requiring silence by a ringing cell phone.  There are, however, some differences in story

line.  Phone Bomb takes place in a barracks-like building or atmosphere, and concerns an

impending bomb explosion.  The Submarine spot, by contrast, highlights a submarine crew

who is attempting to escape enemy detection.

Moreover, however, the court notes that even if the plots of two works *are*

substantially similar, there is no liability if the trier of fact were to conclude that defendant

copied only the basic idea, and independently created a similar plot.  See, e.g., Data East

USA, Inc. v. EPYX, Inc., 862 F.2d 204, 208 (9th Cir. 1988) (similar ideas in two video

games).  As such, and in view of the differences that are apparent in the story line here, the

court concludes that, although the plots are similar, this is not an element that warrants a

finding of overall substantial similarity.  Rather, the similarities between the spots must be

viewed in light of the remaining articulable elements contemplated by the extrinsic test.

United States District Court

For the Northern District of California

1    Action Fighter/Return of the Kwan.  As with the above spots, a comparison of Action

2  Fighter with Return of the Kwan reveals some commonality between the two works, albeit

3  on a broad level.  Action Fighter depicts the story of what appear to be kung-fu martial arts

4  fighters.  A protagonist hero is forced into combat with villains, and the characters attempt

5  to defeat one another, until at a crucial moment they are interrupted by a ringing cell phone

6  sound.  In Return of the Kwan, a hero and villain also meet in combat, and both are also

7  interrupted at the height of the combat by a ringing cell phone heard in the off-screen

8  audience.

9    As with the Phone Bomb/Submarine spots, however, the court concludes that,

10  although these plots, too, are similar in a broad sense, similarity of plot does not warrant a

11  finding of substantial similarity here, particularly in view of the significant differences in the

12  spots, described below.

13                    b.    theme

14    The parties unsurprisingly dispute the definition of applicable themes in these spots.

15  Defendants assert that Phone Bomb has an urban counter-terrorist theme, and Submarine

16  spot has a naval warfare/submarine theme. Similarly, defendants claim that Action Fighter

17  has a "campy kung fu action movie" theme, while Return of the Kwan has an "exotic/epic"

18  theme.  Plaintiff, by contrast, defines the element of theme more broadly, stating that all

19  four spots have the identical theme and message – "that moviegoers should turn off their

20  cell phone during the film or risk facing dire consequences."  See GJP Opp. Br. Re Best

21  Buy II Motion at 11:13-14.

22    Both Phone Bomb and the Submarine spot have similar themes of military activity,

23  danger, and impending death.  Action Fighter has a martial arts theme of hand-to-hand

24  combat between hero and villain, as does Return of the Kwan.  However, it takes more

25  than these broad similarity in themes to rise to the level of substantial similarity worthy of

26  copyright protection.  For, as stated previously, it takes more than general similarities in plot

27  and theme to claim copyright protection – there must be an actual similarity of expression

28

United States District Court

For the Northern District of California

1    that is apparent in the overall 'concept and feel' of the works in question.  See Litchfield v.

2    Spielberg, 736 F.2d at 1357 ("to constitute infringement of expression, the total concept

3    and feel of the works must be substantially similar").

4         On that note, as plaintiff Identity Arts did in the Best Buy I motion, plaintiff GJP here

5    relies on too broad a definition for the element of theme, in its attempt to prove substantial

6    similarity.  While plaintiff is correct that the overall message that all the various spots seek

7    to convey is that cell phone users should refrain from cell phone use during movie

8    showings, this message is part of the overall concept and *idea* for the spots, rather than

9    being expressed as the central theme of each work.  More fundamentally, the message

10   that every movie goer can be a "hero" by turning off their cell phones, simply does not rise

11   to the level of an "actual concrete element[] that make[s] up the total sequence of events

12   and the relationships between the major characters."  See, e.g., Metcalf v. Bochco, 294

13   F.3d 1069, 1074 (9th Cir. 2002).

14             c.    dialogue

15        Plaintiff relies on a comparison of the catch phrase "it's coming from the audience,"

16   in order to demonstrate substantial similarity in the works before the court.  In Phone

17   Bomb, a character exclaims, "it came from the audience," whereas in the Submarine Spot,

18   an on-screen crew member states, "it's coming from the audience."  In Action Fighter, the

19   villain states, "some dummy left his cell phone on ... in the audience," while in Return of the

20   Kwan, the villain states in subtitled format, "it's coming from the audience."

21        Plaintiff completely overlooks, however, the fact that aside from this isolated phrase,

22   the overall dialogue is fundamentally different and distinct in each spot.  Both Phone Bomb

23   and Action Fighter involve a much larger volume of dialogue that helps to develop the story

24   line, and the dialogue is more complex.  In Submarine spot and Return of the Kwan, by

25   contrast, the dialogue is minimal and perfunctory.  While this is largely due no doubt to the

26   length attributed to each spot (Phone Bomb and Action Fighter are longer spots), the fact

27   remains that viewing the dialogue of all spots as a whole, there are more differences than

28

39

United States District Court

For the Northern District of California

1  there are similarities.  Moreover, there is a more fundamental issue that plaintiff overlooks.

2  It is the fact that there is no copyright protection that can be extended to short words and

3  phrases such as the single phrase that plaintiff focuses on here.  See, e.g., Narell v.

4  Freeman, 872 F.2d at 911 ("Ordinary phrases are not entitled to copyright protection."); see

5  also 37 C.F.R. § 202.1(a)(words and short phrases are not subject to copyright).

6      In short, the court finds no substantial similarity of dialogue here, based on the

7  distinctive differences in the dialogue of all four spots as a whole, which differences

8  overshadow the use of the one brief similar phrase by each spot.

9                          d.    mood/setting

10     The mood and setting of all four spots in question are distinct.  In Phone Bomb, the

11 mood is dramatic and tense, as the storyline plays out in the setting of a barracks-like

12 operation.  As the story opens, the main on-screen character is seen disembarking from a

13 helicopter on a rooftop.  In the Submarine spot, by contrast, while the mood is tense, it also

14 invokes a sense of confinement missing from Phone Bomb, as the setting for the story is

15 the interior of an underwater submarine in the deep Pacific Ocean.

16     The differences between Action Fighter and Return of the Kwan are even more

17 striking.  Action Fighter depicts a martial arts story line taking place in a warehouse.  The

18 mood is comedic, with exaggerated characters and techniques that invoke a sense of

19 humor and laughter.  The mood and setting for Return of the Kwan could not be more

20 different.  The spot takes place in an Asian village and on a lake, with the surrounding

21 wilderness as a backdrop.  The mood is that of an epic in the fashion of 'Crouching Tiger,

22 Hidden Dragon.'  It is somber, and serious.

23     In sum, the court does not find that any of the spots in question exhibit substantial

24 similarity of either mood or setting.

25                          e.    pace

26     With respect to pace, too, the spots in question are dramatically different.  Phone

27 Bomb exhibits a rapid, quick-moving tempo that is consistent throughout, while Submarine

28

                                           40

**United States District Court**
For the Northern District of California

1  spot exhibits a slower tempo that speeds up towards the end, as the crew members

2  urgently attempt to silence the off-screen cell phone.  Furthermore, the Phone Bomb spot,

3  at approximately two minutes, is significantly longer than the Submarine Spot, at

4  approximately 35 seconds, a factor that highlights the disparity in pace between the two.

5          As for Action Fighter, it has a quick, light hearted tempo consistent with a comedy

6  spot.  Return of the Kwan, by contrast, has a slower, somber tempo that is more consistent

7  with a dramatic work.  These spots, too, have distinctive running times that highlight

8  disparities in tempo, with Action Fighter running for approximately one and a half minutes,

9  compared to Return of the Kwan's 45 seconds.

10          In sum, the court finds that no substantial similarity is exhibited with respect to pace

11  of the works in question.

12                              f.      characters

13          Plaintiff GJP defines the characters in Phone Bomb and Submarine as "military

14  personnel struggling to avoid destruction and death," and the characters in Action Fighter

15  and Return of the Kwan as "martial arts experts, one a hero and the other a villain,

16  engaged in hand-to-hand martial arts combat."  Defendants, by contrast, point out that the

17  characters must be defined more narrowly than that.  In Phone bomb, the characters

18  included the lead member of the bomb squad, and uniformed troops in and around the

19  building, while in Submarine, the characters were all naval submarine crew members.  In

20  Action Fighter, there was one primary hero and two villains, whereas in Return of the Kwan,

21  there were warriors on horseback, and female villager, and the two characters alone

22  fighting on the lake.

23          The court finds the characters sufficiently distinct in all spots such as to preclude

24  support for a finding of substantial similarity with regard to this element.  The spots employ

25  different characters, none of which is, in appearance, similar to any other.  While it is true

26  that the genre of character may be similar (i.e., martial arts fighter), this is not enough to

27  support a finding that the characters themselves are similar.

28

United States District Court

For the Northern District of California

1    Accordingly, the court finds that plaintiff cannot demonstrate substantial similarity of

2    characters in connection with the spots at issue.

3                        g.        sequence of events

4     Plaintiff here makes many of the same arguments with respect to sequence of

5    events, as did plaintiff Identity Arts in Best Buy I.  Namely, plaintiff here contends:  that in

6    all four spots, the audience is introduced to the major characters, and informed of the need

7    for silence and concentration; that at a crucial moment in the spots, a cell phone ringing is

8    heard, panic and/or distraction ensues, and the on-screen characters realize that the

9    ringing is coming from the audience; that the on-screen characters break the fourth wall,

10   inform the audience that the ringing sound is coming from the theater; and that the

11   characters on-screen are eventually undone by the ringing.  Plaintiff also asserts that the

12   spots in question utilize similar format and editing, as well.

13   As was the case with regard to plaintiff's argument in Best Buy I, the sequence of

14   events that plaintiff describes here is not sufficiently unique or concrete enough to warrant

15   copyright protection.  Rather, here, too, plaintiff defines the scope of copyright protection

16   too broadly, and impermissibly seeks protection for the general idea, or concept, of a movie

17   or film spot whose true nature is a cell phone courtesy message, instead of seeking

18   protection for plaintiff's own *expression* of the same idea.  See, e.g., Berkic, 761 F.2d at

19   1293 ("[g]eneral plot ideas are not protected by copyright law; they remain forever the

20   common property of artistic mankind.").

21   In other words, plaintiff is attempting to seek protection for elements that naturally

22   follow from the idea of a cell phone courtesy message masquerading as a short film piece.

23   A short film piece, for example, would use similar editing and formatting as that in evidence

24   here, with quick shots of differing scenes being utilized to advance the storyline quickly.

25   Similarly, the breaking of the fourth wall is a well-recognized cinematic technique, not a

26   unique or concrete element susceptible of copyright protection.  In short, plaintiff is really

27   seeking protection for natural scenes a faire that flow from the use of the cinematic format,

28

42

United States District Court

For the Northern District of California

1    as described in connection with the Best Buy I motion.  As such, the court finds that no

2    substantial similarity between the works in question can be premised on plaintiff's use of

3    the above sequence of events.

4          In conclusion, and in view of all the differences noted above, the court finds that

5    there simply cannot be said to exist any substantial similarity between the Phone

6    Bomb/Submarine spots, or the Action Fighter/Return of the Kwan spots.

7          As did plaintiff Identity Arts in Best Buy I, plaintiff GJP here attempts to avoid the

8    court's conclusion by arguing that, even if not individually protectable, a unique or creative

9    combination or sequence of elements can nonetheless be protected.  GJP points to the

10   same cases as Identity Arts did in Best Buy I (e.g., Open Source Yoga Unity), as well as

11   the Ninth Circuit's decision in Metcalf v. Bochco, 294 F.3d 1069.  Metcalf does stand for the

12   proposition that, even if not individually protectable, "the presence of so many generic

13   similarities and the common patterns in which they arise" can make a particular sequence

14   protectable.  See id. at 1074.  However, in Metcalf, the "many" generic similarities and

15   patterns present in the works in question were much more voluminous and specific than in

16   this case.  The Metcalf court, for example, considered an original screenplay that had

17   purportedly been infringed by defendant, who had read the screenplay three times, and

18   then had produced his own screenplay based on the same plot.  Defendant's screenplay

19   had the same setting in the same location and city as plaintiff's, dealt with identical issues,

20   had similar looking characters in identical professions, facing the identical challenges.  The

21   sequence of events and happenings in both works was identical, complete with the

22   presence of similar outside characters who enter into the plot.  Id. at 1073-74.  In view of

23   the "cumulative weight" of these similarities, the court found the extrinsic test satisfied.  Id.

24         Here, by contrast, there is no such cumulative weight.  While there are a few striking

25   similarities to be sure (cell phone ringing, "it's coming from the audience"), the fact remains

26   that the works have nothing else in common aside from a broad general plot or theme

27   (military, and martial arts).  The characters, sequence of events, mood, duration, and actual

28

United States District Court
For the Northern District of California

1   story lines are different.  For that reason, not even plaintiff's argument that it is the
2   sequence of elements that makes the works protectable, can help plaintiff.

3          Indeed, just as in Best Buy I, the overall conclusion to be reached here is that
4   plaintiff is attempting to claim an overly broad protection for a general genre of cleverly
5   disguised movie trailers involving a ringing cell phone and exhortation to patrons not to use
6   their cell phones.  As such, there is simply no substantial similarity of protected expression
7   here that can support an infringement claim with respect to either of plaintiff's spots.

8          In sum, there is simply no basis for finding – even taking all the pleading allegations
9   as true – that defendants' two works in question contain elements substantially similar to
10  the protectable elements in plaintiff's own works.  As such, plaintiff's copyright infringement
11  claims fail as to both the Phone Bomb and Action Fighter spots, and judgment on the
12  pleadings is GRANTED to all defendants with respect to plaintiff's first two infringement
13  claims.

14              2.      State Law Claims

15         Defendants Best Buy and Sprint also challenge GJP's two state law claims alleging
16  breach of implied contract and unjust enrichment.  Specifically, they challenge these claims
17  on the basis that they are (a) barred by the statute of limitations, and (b) preempted.

18              a.      Statute of Limitations

19         Both parties agree that the relevant statute of limitations for both state law claims is
20  2 years.  Defendants, however, assert that the 2 year limit has been violated.  They ask the
21  court to take judicial notice of the second amended complaint in Best Buy I, and the fact
22  that this related complaint states that the allegedly offending films began airing on
23  November 21, 2003.  See Best Buy I SAC, ¶ 44.  Since plaintiff's Best Buy II complaint was
24  not filed until December 2005, however, the statute of limitations bars the claim.  In
25  response, GJP challenges the facts that defendants seek to have judicially noticed, and
26  states that it requires fact-based discovery in order to oppose the statute of limitations
27  argument.

28

44

United States District Court

For the Northern District of California

1    Preliminarily, the court notes that, while it is entirely proper to take judicial notice of

2   the Best Buy I complaint, and even of the fact that certain facts are alleged in it, it is not

3   appropriate for the court to take judicial notice of those facts for their substantive truth.  To

4   that end, although the Best Buy I plaintiff alleges that November 21, 2003 was the release

5   date for the Submarine Spot, this is an allegation that the court declines to judicially notice

6   for its substantive truth in this action.  Defendants here urge the court to take notice, in the

7   alternative, of Exhibit G to the first amended complaint in the Best Buy I action – a press

8   release dated November 21, 2003, stating that the marketing campaign was to begin airing

9   during the "holiday" season.  However, even if the court utilized its discretion to take notice

10  of a press release attached as a complaint exhibit on a 12(c) motion, the press release

11  itself is of little value in establishing a relevant date of airing.  The press release, for

12  example, states only that the new marketing program would hit "the big screen along with

13  this year's holiday blockbuster movies."  This could mean December 2003 just as easily as

14  it could refer to a date sometime in November.  If in December, the statute of limitations

15  would have begun running later than the time contended by defendants, making plaintiff's

16  complaint here timely.  In short, there is insufficient information before the court on this

17  motion, for the court to conclude that the claims should be dismissed as untimely.[6]

18   Moreover, given the lack of clarity with respect to the factual issues regarding the

19  airing date of both of plaintiff GJP's spots, the court deems this to be an issue more

20  appropriately addressed with a more developed factual record.  The parties and the court

21  will be in a better position to assess the validity of any arguments going to the statute of

22  limitations issue after adequate discovery on the issue.

23   In sum, the court denies defendants' request for judgment on the pleadings as to

24  plaintiff's two state law claims, on the basis that the claims are untimely.

25

26   [6]  Furthermore, the court notes that there is no release date alleged at all in the
Best Buy I complaint in connection with the Return of the Kwan spot, only the Submarine spot,
27  further demonstrating that the court has insufficient information upon which to determine the
statute of limitations issue.
28

United States District Court

For the Northern District of California

1

b.      Preemption

2      Defendants also contend that both state law claims – for implied breach of contract,

3  and unjust enrichment – are preempted by the Copyright Act.  As mentioned above in

4  connection with the Best Buy I motion, preemption occurs if two conditions are met: the

5  work of authorship falls within the subject matter of the Copyright Act; and the rights that

6  the state law protects are equivalent to those protected by the Copyright Act.  See

7  Kodadek, 152 F.3d at 1212; see also Downing, 265 F.3d at 1003.  As defendants point out,

8  an exception occurs where a state law claim contains some element not shared by federal

9  law "that changes the nature of the action so that it is qualitatively different from a copyright

10  infringement claim."  See, e.g., Summit Machine Tool Mfg. Corp. v. Victor CNC Sys., Inc., 7

11  F.3d 1434, 1439-40 (9th Cir. 1993).

12      First, with respect to plaintiff's claim for implied breach of contract, GJP asserts that

13  the qualitatively different element alleged is that of defendants' agreement to pay for the

14  use of "ideas and concepts."  See Best Buy II SAC, ¶ 65.  Specifically, it alleges that at the

15  November 1, 2000 meeting attended by Best Buy and Sprint, plaintiff disclosed Phone

16  Bomb and Action Fighter "with the understanding and expectation, fully and clearly

17  understood by defendants Best Buy and Sprint, that plaintiff would be reasonably

18  compensated for their use by defendants."  Id. at ¶ 62.

19      Similar to the conclusion reached by the court regarding this issue in Best Buy I,

20  these allegations are sufficient to set forth a Desny claim, in which the court allows an

21  implied breach of contract claim to go forward on the basis that a promise to pay

22  reasonable compensation for an "idea" that is otherwise not protectable under copyright law

23  can be the basis for a state law claim.  See Desny, 46 Cal. 2d at 739; see also Grosso, 383

24  F.3d at 967.

25      Here, GJP makes precisely the same allegations as that put forth in Grosso.

26  Accordingly, GJP's state law claim sufficiently alleges the extra element of an implied

27  promise to pay for the ideas inherent in the Phone Bomb and Action Fighter spots, such

28

46

United States District Court

For the Northern District of California

1    that preemption is avoided.  Defendants attempt to avoid this result by asserting that GJP

2    still fails to allege a "meeting of the minds" with respect to any promise to pay for the ideas

3    in question.  While appealing at first blush, this argument does not take <u>Grosso</u> properly

4    into account.  <u>Grosso</u> considered the identical allegations as those made by plaintiffs here,

5    and the Ninth Circuit held those allegations sufficient.  Accordingly, a <u>Desny</u> claim has been

6    properly stated.

7          The unjust enrichment claim, however, requires a different result.  Not only are

8    plaintiffs' arguments against preemption extremely weak, in <u>Grosso</u>, although the Ninth

9    Circuit allowed an implied breach claim to go forward, it also noted that the Ninth Circuit

10   has previously "held that a claim for unjust enrichment was equivalent to a claim for

11   copyright infringement, and thus preempted, because the claim lacked an extra element –

12   the bilateral expectation of compensation."  <u>Grosso</u>, 383 F.3d at 968.  So here.  Plaintiff

13   GJP's allegations, even though sufficient to state a claim for implied breach of contract

14   under <u>Desny</u>, cannot state a claim for unjust enrichment.  Accordingly, the unjust

15   enrichment claim is preempted.

16         In conclusion, with respect to Best Buy II, GRANTS judgment on the pleadings in

17   favor of defendants with respect to plaintiff's first, second, and fourth causes of action.

18   Judgment on the pleadings is DENIED with respect to plaintiff's third cause of action for

19   breach of implied contract.

20         C.     Conclusion

21         For all the above reasons, the court hereby:  GRANTS judgment on the pleadings in

22   favor of defendants with respect to plaintiff's first, second, third, fourth, and sixth causes of

23   action in the Best Buy I action; DENIES judgment on the pleadings with respect to plaintiff's

24   fifth cause of action in the Best Buy I action; GRANTS judgment on the pleadings in favor

25   of defendants with respect to plaintiff's first, second, and fourth causes of action in the Best

26   Buy II action; and DENIES judgment on the pleadings with respect to plaintiff's third cause

27   of action in the Best Buy II action.

28

1    A case management conference will be held in order to re-calendar dates previously

2  vacated.  The parties shall contact the court's courtroom deputy to schedule an in person

3  or telephonic conference, to occur in May 2007.

4

5  **IT IS SO ORDERED.**

6  Dated: April 18, 2007

7                                                    _____

8                                                    PHYLLIS J. HAMILTON
                                                     United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

48